**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

MOMA BEAUTY SALON, INC.

    *Plaintiff,*

    v.

CLETUS GAZA, *et al.,*

    *Defendants*.

Civil Action No. 24-cv-3381-ELH

**MEMORANDUM OPINION**

MOMA Beauty Salon Inc. ("Moma"), plaintiff, has moved for default judgments against

defendants Cletus Gaza and Ayalex Group ("Ayalex").  *See* ECF 32 (Gaza); ECF 33 (Ayalex)

(collectively, the "Motions").  The Motions pertain to a suit filed by Moma on November 23, 2024,

against Gaza; Ayalex; and East Coast Warehouse & Distribution Corp ("East Coast"), asserting

claims of negligence, breach of contract, and fraud in connection with the shipping of cargo from

Baltimore to Cameroon.  ECF 1 ("Complaint").[1]  The Complaint is supported by exhibits, docketed

collectively at ECF 1-1.  Moma seeks damages totaling $46,142.  ECF 1 at 4-5.

East Coast answered the Complaint.  ECF 8.  Subsequently, Moma resolved the claims as

to East Coast, and East Coast was dismissed from the case on November 24, 2025.  ECF 30; ECF

31.

In a Memorandum and Order of April 9, 2026 (ECF 34), the Court considered the Motions

---

[1] Plaintiff asserts:  "This is a case of admiralty and maritime jurisdiction", pursuant to 28 U.S.C. § 1333.  ECF 1 at 2.  The case was initially assigned to me.  *See* Docket.  Thereafter, the represented parties unanimously consented to a magistrate judge for all proceedings.  ECF 14. Accordingly, the case was referred to Magistrate Judge A. David Copperthite.  ECF 17.  It was later reassigned to Magistrate Judge Chelsea Crawford, due to the retirement of Judge Copperthite. *See* Docket.  In December 2025, after plaintiff filed motions for default against Gaza and Ayalex, the case was assigned back to me.  *Id.*

and stated that, "[o]n the information presented" in the Motions, "the Court is unable to award the damages requested by plaintiff." *Id.* at 12. In particular, the Court pointed to "discrepancies" in "the information contained in the exhibits appended to the Complaint" in regard to damages. *Id.* at 10. The Court also noted that plaintiff "has not clearly articulated the terms governing the contract between" plaintiff and defendants, or specified what duty of care defendants allegedly owed plaintiff. *Id.* at 8–9. Further, the Court said, *id.* at 12: "Even in the face of a default by a defendant, the Court is not a rubber stamp."

Nevertheless, the Court offered plaintiff an opportunity to supplement the record so as to address the Court's concerns, due by May 4, 2026. *Id.* As of mid-July, plaintiff has not supplemented its Motions, and the time to do so has passed. *See* Docket. Accordingly, the Motions are ripe for resolution.

For the reasons that follow, I shall grant the Motions in part. The Court will hold an evidentiary hearing at **11:00 a.m.** on **August 25, 2026**, to determine plaintiff's entitlement to monetary damages.

## I.     Factual Background

As noted, Moma filed suit on November 23, 2024. ECF 1. Plaintiff filed an Affidavit of Service as to defendants on February 20, 2025. ECF 11. It reflects that Gaza and Ayalex were both served with the suit on December 16, 2024. *Id.* at 1 (Gaza); ECF 11-1 at 1 (Ayalex). But, defendants failed to respond to the suit. *See* Docket. As a result, the Clerk entered an order of default against them on November 12, 2025. ECF 27.

The Docket also reflects that the Clerk sent a "Notice Of Default" ("Notice") to Gaza and Ayalex on the same date. ECF 28 (Ayalex); ECF 29 (Gaza). In particular, the Notice indicates that "an order of default was entered" against both defendants and that they had thirty days from the

date of the Notice to "file a motion to vacate the order of default." *Id.* Further, the Notice warned that if defendants did "not take action," the Court would "act promptly on any pending motions for entry of default judgment, which may result in a monetary judgment against" the defendants. *Id.* Neither Notice was returned to the Court as undeliverable. *See* Docket.

Pursuant to Fed. R. Civ. P. 55(b), on December 10, 2025, Moma moved for entry of default judgment as to each defendant. ECF 32 (Gaza); ECF 33 (Ayalex). Plaintiff seeks total damages of $46,142. ECF 32 at 3; ECF 33 at 3. Each motion is supported by a certificate of service (ECF 32 at 2; ECF 33 at 2) and an affidavit in support of the motion for default judgment, authored by plaintiff's counsel (ECF 32 at 3–4; ECF 33 at 3–4). Notably, plaintiff's counsel represents that he sent copies of the Motions in a first class postage-paid envelope to the last known address associated with Gaza (ECF 32 at 2) and Ayalex (ECF 33 at 2). Defendants have not responded to the Motions. And, the time to do so has expired. *See* Local Rule 105.2(a).

Moma alleges that it hired and paid Gaza to assist in the shipping of its cargo. ECF 1, ¶¶ 2, 4. According to plaintiff, Gaza subcontracted his freight forwarder duties to Ayalex, calling Ayalex his business partner. ECF 1, ¶ 4. And, Gaza allegedly "promised" to pay the freight forwarder fees he had received from Moma to Ayalex. *Id.*

In support of Moma's contentions, plaintiff refers to an invoice docketed at ECF 1-1 at 2, which plaintiff calls a "Bill of Lading." *See id.* at 1. [2] The Bill of Lading is an invoice for $5,916 from Ayalex to Gaza for a variety of shipping charges that pertain to the shipment of Moma's cargo

---

[2] A bill of lading is "a document issued by a carrier that lists goods being shipped and specifies the terms of their transport[.]" *Bill of Lading,* MERRIAM WEBSTER DICTIONARY (last accessed July 14, 2026), https://perma.cc/NQW6-4SRU.

from the Port of Baltimore, Maryland to Douala, Cameroon. *Id.* at 2–3.[3] The Bill of Lading lists

Divine Ndoh Moma as both the shipper and the consignee. *Id.* at 2.

Plaintiff claims that it paid Gaza $5,916 in shipping charges and $2,000 in "demurrage."[4]

ECF 1, ¶ 4.[5] However, Moma provides no proof of actual payment.

In the Complaint, Moma alleges: "Plaintiff performed on the contract by making payments

to Cletus Gaza (see Exhibit 5, Payments to Cletus Gaza)". ECF 1, ¶ 14. But, plaintiff's Exhibit 5

is a photo of a receipt for a transaction involving payment of $3,000 to East Coast. ECF 1-1 at

15.[6] Moreover, the Bill of Lading (ECF 1-1 at 2) reflects a total charge of $5,916, *inclusive* of

demurrage of $1,320. But, it is merely an invoice from Ayalex to Gaza, without any indication

that payment was made by plaintiff.

Additionally, plaintiff alleges that the documents it has submitted as "Exhibit 2" reflect

payment of additional demurrage charges. ECF 1, ¶ 10; ECF 1-1 at 1 (labelling Exhibit 2 as

"Additional Demurrage & Late Charges"). Exhibit 2 consists of two documents: (1) a photo of a

receipt (ECF 1-1 at 4); and (2) a copy of bills issued by the Régie Du Terminal À Conteneurs

("RTC") (ECF 1-1 at 5–6). The receipt pertains to a transaction with PNC Bank, in the sum of

$3,500, dated January 23, 2024. ECF 1-1 at 4. The receipt appears to have the words "Ndoh

---

[3] Plaintiff labels ECF 1-1 at 2–3 as "Exhibit 1." *Id.* at 1. Plaintiff's Exhibit 1 consists of two pages; both pages appear to be part of the same invoice from Ayalex to Gaza. Plaintiff refers to the first page as the "Bill of Lading" and the second page as the "Cargo Manifest." *Id.*

[4] Demurrage is "a charge for detaining a ship, freight car, or truck[.]" *Demurrage,* MERRIAM WEBSTER DICTIONARY (last accessed Apr. 1, 2026), https://perma.cc/MQB6-22K6.

[5] The total payment would equal $7,916. But, in ECF 1, ¶ 4, plaintiff alleges that plaintiff paid Gaza $75,916. Presumably, this is a typographical error.

[6] The receipt indicates that the transaction amount was $3,000. ECF 1-1 at 15. And, $123.63 of fees were levied, yielding a total of $3,123.63. *Id.*

Payment Container" handwritten on it, although the handwriting is not entirely clear. *Id.* The payee is not identified. Nor is there a clear indication on the document as to the purpose for the payment.

The RTC bills reflect a total charge of $ 262,827 Central African CFA francs. ECF 1-1 at 5–6. The bills are in French and plaintiff has not provided English translations. Nor has plaintiff converted the amount charged in the RTC bills into U.S. currency.

In sum, none of the records that plaintiff has provided substantiate that Moma actually paid Gaza or Ayalex for the amounts that Moma seeks to recover.

Moma's cargo, which consisted of "a 2015 Hyundai Santa Fe, a 2007 Mitsubishi Outlander, a 1995 Toyota Tacoma, scores of I-phones and other consumable goods", was "stuffed" in a shipping container. ECF 1, ¶ 3. But, plaintiff claims: "The Defendants negligently assigned a wrong container for the cargo causing the container to be drayed back to the warehouse where it was unstuffed, and then re-stuffed into the correct container." *Id.* ¶ 7. Then, "US Customs . . . flagged the container for secondary inspection[.]" *Id.* ¶ 8.

To comply with the inspection, the goods were "unstuffed for inspection and re-stuffed at East Coast," without notice to plaintiff, whose representatives therefore were not present "to ensure that cargo was properly loaded." *Id.* Plaintiff asserts that Gaza and Ayalex "failed to notify" Moma "in a timely manner" when the inspection was complete, "causing the container to incur unnecessary additional demurrage charges." *Id.* ¶ 10 (citing ECF 1-1 at 4–6, labeled as "Exhibit 2 Additional Demurrage & Late Charges"). And, the container was "stuffed incorrectly." ECF 1, ¶ 8. Therefore, when the goods arrived in Cameroon, they were severely damaged. *Id.* ¶ 11; *see* ECF 1-1 at 7–14 (Joint Cargo Survey Report).

Mr. Divine Moma, a representative of Moma, traveled to Douala, Cameroon "to clear the container [containing Moma cargo] through Customs." ECF 1, ¶ 15; *see id.* ¶ 13. According to plaintiff, Ayalex claimed that Gaza "never transferred the freight charges and fees payments that Moma Beauty Salon made to [Gaza] to pay the freight forwarder." *Id.* ¶ 13. Therefore, plaintiff "could not clear the container through customs[.]" *Id.* Plaintiff claims that on February 15, 2024, Moma paid Ayalex the freight forwarder fees of $5,916, "[u]nder duress." *Id.* ¶ 16. Moma does not include proof of payment. Subsequently, plaintiff was able to clear the shipping container through customs but the cargo was "damaged[.]" *Id* ¶ 17.

In short, plaintiff claims that Gaza misappropriated the money Moma paid to him to cover the freight forwarding fees, forcing Moma to pay twice for freight forwarding services, for which it only should have had to pay once. *See id.* ¶ 15. Further, Moma contends that because of Gaza's "misappropriation of the funds intended for the freight forwarder, Ayalex Group, Mr. Divine Moma . . . became stranded in Douala for two months and three weeks while attempting to clear the container." *Id.* As a result, the beauty salon became inactive, causing lost revenue. *Id.* at 4. Moreover, Mr. Moma incurred hotel charges to stay in Cameroon, and Mr. Moma claims that he lost income from his healthcare job. *Id.* at 5. But, no records of such losses have been provided.

Plaintiff asserts joint and several liability of Gaza and Ayalex as to the sum of $5,916. *Id.* at 4. Further, Moma seeks to recover from the defendants the sum of $3,200 for "demurrage that he was forced to pay" due to defendants' negligence, *i.e.*, Moma's cargo being "assigned a wrong container" and Moma not being "notified in a timely manner when [the] container was flagged for secondary inspection[.]" *Id.*

And, Moma seeks to recover $24,900 from defendants "for revenue Plaintiff lost due to business interruption when [Moma's] beauty salon in Baltimore was inactive while [Mr. Moma]

6

was stuck in Douala, Cameroon, dealing with container clearance delays . . . ." *Id.* Additionally, Moma seeks $7,750 from defendants to compensate for the time Mr. Moma could not report to his healthcare job because he was stuck in Douala, and $4,736 for hotel charges Mr. Moma incurred during his time in Douala, due to the negligence and "malfeasance" of defendants. *Id.* at 5; *see id.* at 4-5.

As indicated, plaintiff has not provided the Court with any records to substantiate that Moma sustained these losses or incurred these charges during Mr. Moma's extended say in Cameroon. Nor has Moma provided any affidavits as to the expenses.

Plaintiff has not advised the Court as to the sum collected from East Coast in settlement. Nor has he addressed whether this sum constitutes a set off as to monies that plaintiff seeks from Gaza and Ayalex.

## II.    Legal Standards

### A.  Fed. R. Civ. P. 54 and 55

Rule 55(b) of the Federal Rules of Civil Procedure governs default judgment. In particular, Rule 55(b)(1) provides that the clerk may enter a default judgment if plaintiff's claim is "for a sum certain or a sum that can be made certain by computation."[7] But, "[a] plaintiff's assertion of a sum in a complaint does not make the sum 'certain' unless the plaintiff claims liquidated damages; otherwise, the complaint must be supported by affidavit or documentary evidence." *Monge v.*

---

[7] If the sum is not certain or ascertainable through computation, the court looks to Rule 55(b)(2) ("The court may conduct hearings or make referrals--preserving any federal statutory right to a jury trial--when, to enter or effectuate judgment, it needs to: (A) conduct an accounting; (B) determine the amount of damages; (C) establish the truth of any allegation by evidence; or (D) investigate any other matter.").

*Portofino Ristorante*, 751 F. Supp. 2d 789, 794 (D. Md. 2010) (Grimm, M.J.).[8]

Rule 55(b)(2) states, in part: "In all other cases, the party must apply to the court for a default judgment." In *Aleman v. Marroquin*, GLR-23-2475, 2025 WL 2050959, at *2 (D. Md. July 22, 2025), the court explained: "If, after entry of default, the Plaintiff's complaint does not specify a sum certain amount of damages, the court may enter a default judgment against the defendant pursuant to Rule 55(b)(2)." (Internal quotation marks omitted).

Further, Rule 55(b)(2) provides that the court "may conduct hearings or make referrals--preserving any federal statutory right to a jury trial--when, to enter or effectuate judgment, it needs to: (A) conduct an accounting; (B) determine the amount of damages; (C) establish the truth of any allegation by evidence; or (D) investigate any other matter."

The Fourth Circuit has a "strong policy favoring the disposition of cases on the merits . . . ." *Rangarajan v. Johns Hopkins Univ.*, 917 F.3d 218, 229 (4th Cir. 2019) (discussing *United States v. Shaffer Equip. Co.*, 11 F.3d 450, 462 (4th Cir. 1993)), *cert. denied*, 588 U.S. 909 (2019); *see Projects Mgmt. Co. v. Dyncorp Int'l LLC*, 734 F.3d 366, 376 (4th Cir. 2013); *Benchmark Ins. Co. v. Total Remodeling Contractor LLC*, LKG-25-00811, 2026 WL 319051, at *3 (D. Md. Feb. 6, 2026). However, the policy is not absolute. Entry of default judgment under Rule 55(b)(2) "is left to the discretion of the court." *SEC v. Lawbaugh*, 359 F. Supp. 2d 418, 421 (D. Md. 2005). And, default judgment "'is appropriate when the adversary process has been halted because of an essentially unresponsive party.'" *Garnier-Thiebaut, Inc. v. Castello 1935 Inc.*, SDT-17-3632, 2019 WL 6696694, at *1 (D. Md. Dec. 6, 2019) (Thacker, J.) (quoting *Int'l Painters & Allied Trades*

---

[8] Judge Grimm authored *Monge* when he served as a United States Magistrate Judge. He subsequently served as a United States District Court Judge in Maryland. Judge Grimm retired from judicial service in December 2022.

*Indus. Pension Fund v. Cap. Restoration & Painting Co.*, 919 F. Supp. 2d 680, 684 (D. Md. 2013)); *see Lawbaugh*, 359 F. Supp. 2d at 421.

When a default judgment is entered, plaintiff's factual allegations are deemed admitted, except those pertaining to damages. *See* Fed. R. Civ. P. 8(b)(6); *Ryan v. Homecomings Fin. Network*, 253 F.3d 778, 780 (4th Cir. 2001) (stating that because of the default, the court accepts as true the well pleaded factual allegations in the Complaint as to liability); *United States v. Bob Bakers Golden Servs. Inc.*, PX-22-191, 2023 WL 3304897, at *2 (D. Md. May 8, 2023). Allegations "relating to the amount of damages" are not deemed admitted based on a defendant's failure to respond to a suit.  Fed R. Civ. P. 8(b)(6); *see Monge*, 751 Supp. 2d at 794; *Trs. Of the Elec. Welfare Trust Fund v. MH Passa Elec. Contracting, Inc.*, DKC-08-2805, 2009 WL 2982951, at *1 (D. Md. Sept. 14, 2009) ("Upon default, the well-pled allegations in a complaint as to liability are taken as true, although the allegations as to damages are not."); *Pentech Fin. Servs., Inc. v. Old Dominion Saw Works, Inc.*, NKM-09-0004, 2009 WL 1872535, at *1 (W.D. Va. June 30, 2009) ("Upon default judgment, Plaintiff's factual allegations are accepted as true for all purposes excluding determination of damages."); *United States v. Bob Bakers Golden Servs. Inc.*, PX-22-191, 2023 WL 3304897, at *2 (D. Md. May 8, 2023).

Moreover, as to a default judgment, the court must determine whether the undisputed factual allegations constitute a legitimate cause of action.  *Ryan*, 253 F.3d at 780–81.  If the court is satisfied that liability has been established, it must then determine the appropriate amount of damages.  *Id.*; *see Bob Bakers Golden Servs. Inc.*, 2023 WL 3304897, at *2; *Credit Lyonnais Sec. (USA), Inc. v. Alcantara*, 183 F.3d 151, 154 (2d Cir. 1999).

In so doing, the court may conduct an evidentiary hearing.  Fed. R. Civ. P. 55(b)(2). However, the court may also make a determination of damages without a hearing, so long as there

9

is an adequate evidentiary basis in the record to support an award of the requested damages. *See Adkins v. Teseo*, 180 F. Supp. 2d 15, 17 (D.D.C. 2001) ("[T]he court may rely on detailed affidavits or documentary evidence to determine the appropriate sum."); *see also Trustees of the Nat'l Asbestos Workers Pension Fund v. Ideal Insulation, Inc.*, ELH-11-832, 2011 WL 5151067, at *4 (D. Md. Oct. 27, 2011) (determining that, in a case of default judgment against an employer, "the Court may award damages without a hearing if the record supports the damages requested"); *Monge,* 751 F. Supp. 2d at 795 (same); *Pentech Fin. Servs., Inc.*, 2009 WL 1872535, at *2 (concluding that there was "no need to convene a formal evidentiary hearing on the issue of damages" after default judgment because plaintiff submitted affidavits and records establishing the amount of damages); *JTH Tax, Inc. v. Smith*, RAJ-06-0076, 2006 WL 1982762, at *3 (E.D. Va. June 23, 2006) ("If the defendant does not contest the amount pleaded in the complaint and the claim is for a sum that is certain or easily computable, the judgment can be entered for that amount without further hearing.").

Fed. R. Civ. P. 54(c) is also pertinent.  It provides that "[a] default judgment must not differ in kind from, or exceed in amount, what is demanded in the pleadings."  *See In re Genesys Data Techs, Inc.*, 204 F.3d 124, 132 (4th Cir. 2000) ("When a Complaint demands a specific amount of damages, courts have generally held that a default judgment cannot award additional damages."). This is meant to enable the defendant to decide whether to expend the resources to defend the action.  *Monge*, 751 F. Supp. 2d at 796.

## B.  Choice of Law

Ordinarily, "[w]ith admiralty jurisdiction comes the application of substantive admiralty law." *East River S.S. Corp. v. Transamerica Delaval, Inc.,* 476 U.S. 858, 864 (1986).  The body of substantive admiralty law "is an amalgam of traditional common-law rules, modifications of

those rules, and newly created rules," *id.* at 864–65, developed in service of the overriding principles of "harmony and uniformity" that form a primary rationale for federal admiralty jurisdiction. *Parker v. Motor Boat Sales, Inc.,* 314 U.S. 244, 248 (1941). "But it does not follow . . . that every term in every maritime contract can only be controlled by some federally defined admiralty rule." *Wilburn Boat Co. v. Fireman's Fund Ins. Co.,* 348 U.S. 310, 313 (1955). "Uniformity is required only when the essential features of an exclusive federal jurisdiction are involved." *Just v. Chambers,* 312 U.S. 383, 392 (1941).

In *Kossick v. United Fruit Co.,* 365 U.S. 731 (1961), the Supreme Court made clear that state law may govern in an admiralty case if "the alleged contract, though maritime, is 'maritime and local,' in the sense that the application of state law would not disturb the uniformity of maritime law." *Id.* at 738 (citations omitted). *See Norfolk S. Ry. Co. v. Kirby*, 543 U.S. 14, 22–23 (2004) (applying *Kossick* ); *McMellon v. United States,* 338 F.3d 287, 303 (4th Cir. 2003) (stating that "admiralty courts may apply state law" so long as application of state law would not "'frustrate national interests in having uniformity in admiralty law'") (citation omitted), *vac'd en banc on other grounds,* 387 F.3d 329 (4th Cir. 2004).

In this case, all of the parties are Maryland citizens. It appears that plaintiff contracted with Gaza in Maryland, although there is no specific allegation to this effect. The stuffing and re-stuffing of the cargo apparently took place in Maryland, at the East Coast facility. ECF 1, ¶ 9. Moreover, the issues primarily concern the law of contract and tort, creatures of state law. *See Butler v. Edisto Elec. Coop. Inc.*, SAL-24-4140, 2024 WL 4756295, at *2 (D.S.C. Sept. 30, 2024) ("[C]ontract and tort [are] grounded in state law[.]"), *report and recommendation adopted,* 2024 WL 4753593 (D.S.C. Nov. 12, 2024); *Yates v. Med. Specialties, Inc.*, MOC-11-6, 2011 WL 2183156, at *6 (W.D.N.C. June 6, 2011) ("[T]he causes of action for breach of contract are clearly

11

created by state common law."). And, state law typically governs common law causes of action, such as tort claims. *See, e.g., Erie R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938) ("Except in matters governed by the Federal Constitution or by acts of Congress, the law to be applied in any case is the law of the state. And whether the law of the state shall be declared by its Legislature in a statute or by its highest court in a decision is not a matter of federal concern.")

Accordingly, in resolving whether plaintiff has alleged facts to support claims of breach of contract, fraud, and negligence against Gaza and Ayalex, the Court will apply the law of Maryland.

### III.   Discussion

### A.  Liability

As stated, plaintiff has lodged claims of negligence, breach of contract, and fraud. ECF 1, ¶¶ 6–18. Although plaintiff has styled its "Breach of Contract and Fraud" claim as a single claim, these are separate causes of action. *See Ndeumeni v. Kemogne*, No. 1992 Sept. Term 2014, 2015 WL 7739709, at *4 (Md. Ct. Spec. App. Dec. 1, 2015) ("Undoubtedly, in Maryland the questions of whether a fraud has been committed with respect to a contract and whether a plaintiff may prevail in a breach of contract action are completely separate inquiries.").

### 1. Breach of Contract and Fraud

The Complaint contains claims for breach of contract and fraud. But, plaintiff alleges only that Gaza breached the contract and engaged in fraud. ECF 1, ¶¶ 13-18.

In general, a contract is defined as "a promise or set of promises for breach of which the law gives a remedy, or the performance of which the law in some way recognizes as a duty." Richard A. Lord, 1 *Williston on Contracts* § 1:1, at 2–3 (4th ed. 1990); *accord* Restatement (Second) Contracts § 1, at 5 (1981); *see also Maslow v. Vanguri*, 168 Md. App. 298, 321, 896 A.2d 408, 421–22 (Hollander, J.), *cert. denied*, 393 Md. 478, 903 A.2d 416 (2006).

12

Under Maryland law, the elements of a claim for breach of contract are "'contractual obligation, breach, and damages.'" *Tucker v. Specialized Loan Servicing, LLC*, 83 F. Supp. 3d 635, 655 (D. Md. 2015) (quoting *Kumar v. Dhanda*, 198 Md. App. 337, 17 A.3d 744, 749 (2011)). To "prevail in an action for breach of contract, a plaintiff must prove that the defendant owed the plaintiff a contractual obligation and that the defendant breached that obligation." *Taylor v. NationsBank, N.A.*, 365 Md. 166, 175, 776 A.2d 645, 651 (2001); *accord Belyakov v. Med. Sci. & Computing*, 86 F. Supp. 3d 430, 437 (D. Md. 2015); *see also RRC Northeast, LLC v. BAA Maryland, Inc.*, 413 Md. 638, 658, 994 A.2d 430, 442 (2010).

In other words, "[i]t is the parties' agreement that ultimately determines whether there has been a breach." *Mathis v. Hargrove*, 166 Md. App. 286, 318-19, 888 A.2d 377, 396 (2005). In *Polek v. J.P. Morgan Chase Bank, N.A.*, 424 Md. 333, 362, 36 A.3d 399, 416 (2012), the Maryland Court of Appeals[9] said: "Maryland law requires that a plaintiff alleging a breach of contract 'must of necessity allege with certainty and definiteness *facts* showing a contractual obligation owed by the defendant to the plaintiff and a breach of that obligation by defendant.'" (Citation omitted) (emphasis in *Polek*); *see also Robinson v. GEO Licensing Co., L.L.C.*, 173 F. Supp. 2d 419, 423 (D. Md. 2001).

Plaintiff claims that it "entered into a contract with Cletus Gaza for the shipment of a container to Douala, Cameroon[.]" ECF 1, ¶ 14. Moreover, plaintiff alleges that it paid Gaza

---

[9] In the general election held in Maryland in November 2022, the voters of Maryland approved a constitutional amendment to change the name of the Maryland Court of Appeals to the Supreme Court of Maryland. And, the voters also approved a change in the name of the State's intermediate appellate court, from the Maryland Court of Special Appeals to the Appellate Court of Maryland. These changes went into effect on December 14, 2022. *See* Press Release, Maryland Courts, *Voter-approved constitutional change renames high courts to Supreme and Appellate Court of Maryland* (Dec. 14, 2022), https://perma.cc/TL89-QFKR. However, I shall refer to the courts by the names that were in effect when the cited decisions were issued.

$5,916 in shipping charges and $2,000 for a demurrage fee.  *Id.* ¶ 4. And, according to plaintiff, "Mr. Gaza promised to pay that amount to Ayalex Group", "purported to be his business partners." *Id.*   Further, plaintiff asserts that it "performed on the contract by making payments to Cletus Gaza."  *Id.* ¶ 14.   But, Gaza allegedly "breached the contract by subcontracting his freight forwarding obligations to Ayalex, and not paying Ayalex for their services." *Id.*

According to plaintiff, "[a]s a result of Cletus Gaza's misappropriation of the funds intended for the freight forwarder, Ayalex Group, Mr. Divine Moma, the Moma Beauty Salon representative . . . became stranded in Douala for two months and three weeks while attempting to clear the container." *Id.* ¶ 15. And, plaintiff claims:  "Under duress, Plaintiff had to pay $5916 a second time on February 15 2024, but this time directly to Ayalex Group for them to release the container to the Consignee." *Id.* ¶ 16.

In sum, under the terms of the alleged contract between Gaza and Moma, Gaza was a middle man.  Moma paid Gaza the requested shipping fees, which Gaza promised to provide to Ayalex, so that Ayalex would then coordinate the shipping of Moma's cargo. But, Gaza breached his obligation, misappropriating the funds he received from Moma and failing to pay Ayalex for its shipping services.

Taking as true the factual allegations in the Complaint, as I must, plaintiff has sufficiently alleged that Gaza had an obligation to Moma, which he breached.  Plaintiff has established Gaza's liability as to its breach of contract claim.[10]

---

[10] As noted, plaintiff has not alleged that Ayalex was in breach of an agreement with Moma or engaged in fraud.  As discussed, *infra,* plaintiff has essentially alleged that Moma was a third party beneficiary to an agreement between Ayalex and Gaza, which forms the basis of its negligence claim.

In Maryland, fraud, or intentional misrepresentation, has five elements, *Hencken v. Jacobs*, No. 2209, Sept. term, 2023, 2025 WL 274427, at *11 (App. Ct. Md. Jan. 23, 2025) (citing *Hoffman v. Stamper*, 385 Md. 1, 28 (2005)):

> (1) [T]he defendant made a false representation to the plaintiff, (2) the falsity of the representation was either known to the defendant or the representation was made with reckless indifference to its truth, (3) the misrepresentation was made for the purpose of defrauding the plaintiff, (4) the plaintiff relied on the misrepresentation and had the right to rely on it, and (5) the plaintiff suffered compensable injury as a result of the misrepresentation.

Because I have determined that Moma established Gaza's liability for breach of contract, I need not reach the question of whether Gaza also engaged in fraud. In sum, taking as true the factual allegations in the Complaint, plaintiff has sufficiently alleged that Gaza breached its contract with Moma. Therefore, plaintiff's motion for entry of default judgment will be granted as to the request for entry of default judgment against Gaza for plaintiff's breach of contract claim.

### 2. Negligence

Plaintiff alleges that both Gaza and Ayalex were negligent. In particular, Moma claims defendants had a duty to ship its cargo "with the level of professionalism reasonably expected from a freight forwarder." ECF 1, ¶ 6. According to plaintiff, defendants acted "negligently" by assigning "a wrong container for the cargo causing the container to be drayed back to the warehouse where it was unstuffed, and then re-stuffed into the correct container." *Id.* ¶ 7. Further, plaintiff asserts that defendants failed to inform plaintiff when the cargo was flagged by U.S. customs for secondary inspection, and failed to timely inform plaintiff when the inspection was completed. *Id.* ¶¶ 8, 10.

Moma complains that "Defendants did not provide an opportunity for Plaintiff to make his expert container handlers available . . . ." *Id.* ¶ 11. According to plaintiff, because of defendants' negligence, the cargo was "unstuffed for inspection and restyled . . . without the Plaintiff's

representatives being present to ensure that cargo was properly loaded. This resulted in the container being stuffed incorrectly." *Id.* ¶ 8. And, as a result, Moma claims that the cargo "was severely damaged during transit." *Id.* ¶ 11. Moreover, Moma alleges that "unnecessary additional demurrage charges" were incurred. *Id.* ¶ 10.

In general, to assert a claim of negligence in Maryland, "a complaint must allege facts sufficient to support a finding of: 1) a duty to the plaintiff (or to a class of which the plaintiff is a part), 2) a breach of that duty, and 3) a causal relationship between the breach and the harm, and 4) damages suffered." *Balfour Beatty Infrastructure, Inc. v. Rummel Klepper & Kahl, LLP*, 226 Md. App. 420, 438, 130 A.3d 1024, 1034 (2016), *aff'd*, 451 Md. 600, 155 A.3d 445 (2017); *see Steamfitters Loc. Union No. 602 v. Erie Ins. Exch. No. 40*, 469 Md. 704, 727, 233 A.3d 59, 72 (2020); *Schultz v. Bank of Am.*, N.A., 413 Md. 15, 27, 990 A.2d 1078, 1086 (2010); *Walpert, Smullian & Blumenthal, P.A. v. Katz*, 361 Md. 645, 655, 762 A.2d 582, 587 (2000); *Jacques v. First Nat. Bank of Md.*, 307 Md. 527, 531, 515 A.2d 756, 758 (1986); *Cramer v. Hous. Opportunities Comm'n of Montgomery Cnty.*, 304 Md. 705, 712, 501 A.2d 35, 39 (1985). Some courts describe the damages element as the "actual injury or loss" that the "plaintiff suffered[.]" *Steamfitters Loc. Union No. 602*, 469 Md. at 727, 233 A.3d at 72; *see Balfour Beatty Infrastructure, Inc.*, 451 Md. at 610, 155 A.3d at 451; *100 Inv. Ltd. P'ship v. Columbia Town Ctr. Title Co.*, 430 Md. 197, 212–13, 60 A.3d 1, 10 (2013).

Plaintiff claims that the Bill of Lading issued by Ayalex to Gaza regarding the shipping of Moma's cargo created "a duty for Defendants to provide the stipulated services with the level of professionalism reasonably expected from a freight forwarder." ECF 1, ¶ 6.

"A 'bill of lading' is a contract for the carriage of goods by sea." *Hawkspere Shipping Co. v. Intamex, S.A.*, 330 F.3d 225, 229 (4th Cir. 2003). Put another way, a "'bill of lading is a receipt

given by a carrier for goods shipped, and a contract containing the terms of their carriage.'" *Allied Signal Tech. Servs. Corp. v. M/V Dagmar Maersk*, 234 F. Supp. 2d 526, 528 (D. Md. 2002) (quoting *AIG Eur., S.A. v. M/V MSC Lauren*, 940 F. Supp. 925, 929 (E.D. Va. 1996), *aff'd sub nom. AIG Eur., S.A. v. Locust Point Terminal Corp.*, 134 F.3d 362 (4th Cir. 1998)).   The bill of lading "represents title to the goods, and the carrier must release the goods to the party entitled to them under the bill of lading." *Strachan Shipping Co. v. Dresser Indus., Inc.*, 701 F.2d 483, 488 (5th Cir. 1983).   Because "the bill of lading is a contract between the carrier and the shipper . . . the carrier has a contractual right to expect payment pursuant to that bill." *National Shipping Co. of Saudi Arabia v. Omni Lines, Inc.,* 106 F.3d 1544, 1547 (11th Cir. 1997).

"A third-party beneficiary is someone who the contract was intended to benefit, and the parties clearly intended for that person to benefit and be privy to the promise." *Nasi v. Phillips*, No. 415, Sept. Term, 2025, 2026 WL 775407, at *10 (App. Ct. Md. Mar. 19, 2026).   "Despite the fact that a third-party beneficiary is not a party to the contract, he or she can bring suit to enforce the contract." *Dickerson v. Longoria*, 414 Md. 419, 452, 995 A.2d 721, 741 (2010).

Mr. Moma is listed as the "consignee" and the "shipper" on the Bill of Lading.  ECF 1-1 at 2.  The Bill of Lading reflects that Ayalex charged Gaza $5,916 to ship Moma's cargo, inclusive of demurrage.  *Id.* at 2–3.   Clearly, Moma was intended to benefit from the agreement between Gaza and Ayalex, by which Ayalex was to ship Moma's cargo.  Ayalex  assumed a contractual duty to ship Moma's cargo.  *See id.*

In Maryland, "'[t]he mere negligent breach of a contract, absent a duty or obligation imposed by law independent of that arising out of the contract itself, is not enough to sustain an action sounding in tort.'"  *Blondell v. Littlepage*, 413 Md. 96, 120–21, 991 A.2d 80, 94 (2010) (quoting *Jacques v. First Nat. Bank of Maryland*, 307 Md. 527, 534, 515 A.2d 756, 759 (1986)).

17

"'This principle is applicable even when the failure to perform the contract results from the defendant's negligence.'" *Bolton v. Queen*, No. 71, Sept. Term, 2020, 2021 WL 1426787, at *6 (Md. Ct. Spec. App. Apr. 15, 2021) (quoting *Jones v. Hyatt Ins. Agency, Inc.*, 356 Md. 639, 654, 741 A.2d 1099, 1107 (1999)).

"There is no single principle or simple test for determining when a defendant's breach of a contract will also breach an independent duty and give rise to a tort action." *Mesmer v. Maryland Auto. Ins. Fund*, 353 Md. 241, 254, 725 A.2d 1053, 1059 (1999). "Nevertheless, when the dispute is over the existence of any valid contractual obligation covering a particular matter, or where the defendant has failed to recognize or undertake any contractual obligation whatsoever, the plaintiff is ordinarily limited to a breach of contract remedy." *Id.* "It is when the defendant has proceeded on the basis that a contractual obligation exists, has undertaken that obligation, and has undertaken it in violation of the appropriate standard of care, that the plaintiff may, in some circumstances, maintain a tort action." *Id.*

Plaintiff's allegations fall into the latter category. Moma alleges that defendants breached their respective duties under the Bill of Lading to coordinate the shipping of Moma's cargo, "with the level of professionalism reasonably expected from a freight forwarder." ECF 1, ¶ 6. In other words, plaintiff alleges that defendants undertook this obligation "in violation of the appropriate standard of care," not that defendants failed to "undertake any contractual obligation whatsoever[.]" *See Mesmer*, 353 Md. at 254, 725 A.2d at 1059.

Even with the limited record provided by plaintiff, it is clear that when defendants assigned Moma's cargo to the wrong container, and when the goods were damaged in transit, defendants breached a duty regarding the shipping of Moma's cargo.

18

On the other hand, plaintiff has provided the Court with no information as to the industry standard when a shipping container is flagged for a secondary inspection by customs. Nor has plaintiff specified whether the agreement between Moma and Gaza, or the agreement between Ayalex and Gaza, contemplated what should be done if the shipping container was flagged for a secondary inspection. Moreover, Moma has not indicated when it was informed that the secondary inspection was completed, which would be essential to any determination of whether defendants acted in a "timely" manner. *See* ECF 1, ¶ 10. Accordingly, the Court does not find that plaintiff has alleged that defendants acted negligently when they failed to inform Moma that plaintiff's cargo has been flagged for a second customs inspection or failed to timely inform Moma that the inspection was complete. *See* ECF 1, ¶¶ 8, 10.

Therefore, plaintiff's recovery for its negligence claim is limited to damages stemming from the defendants' failure to assign Moma's cargo to the correct shipping container. *See id* ¶ 7. As noted, plaintiff also claims that "the container was negligently re-stuffed after inspection and because Defendants did not provide an opportunity for Plaintiff to make his expert container handlers available to supervise the operation, the cargo was severely damaged during transit." ECF 1, ¶ 11. But, plaintiff does not seek to recover for the diminution of value to its cargo. *See* ECF 1 at 4–5; ECF 32; ECF 33. *See Trs. of the Nat'l Asbestos Workers Med. Fund v. Stotts Mech. Insulation Inc.*, TDC-15-2789, 2016 WL 3606329, at *3 (D. Md. June 24, 2016) (plaintiff "can recover only what [it] pled in the Complaint.").

I will grant Moma's motion for entry of default judgment with respect to its negligence claims against both defendants.

### B. Damages

The Court has awarded default judgment as to liability for breach of contract by Gaza, as well as negligence by Gaza and Ayalex. But, the question of damages must also be resolved.

In the Motions, plaintiff seeks a total award of $46,142 in compensatory damages. ECF 32 at 3; ECF 33 at 3. The Court must determine whether plaintiff has proven damages and, if so, in what amount.

In connection with plaintiff's negligence claim, plaintiff asserts: "[T]hrough their negligence, defendants caused plaintiff to pay $3200 for demurrage because he was assigned a wrong container, was not notified in a timely manner when his container was flagged for secondary inspection, and was not notified when it was ready for pick up[.]" ECF 32 at 3–4; ECF 33 at 3–4. Plaintiff also claims that Moma "lost $7,750 of income that when [sic] he couldn't report to his healthcare job in Baltimore because be [sic] was stuck in Douala, Cameroon, because of defendant(s) negligence." ECF 32 at 4; ECF 33 at 4. In addition, Moma claims: "Defendant(s) through negligence caused plaintiff to pay $4,376 for hotel charges that they had to pay in Douala, Cameroon, to stay there and resolve issues that were causing delays in clearing their container through customs because Defendant did not pay money that they were supposed to pay to the shipping lines and/or freight forwarder[.]" ECF 32 at 4; ECF 33 at 4.

Further, Moma asserts: "Defendants Cletus Gaza and Ayalex caused plaintiff to pay $5916 twice to them for the same freight forwarding services and fees . . . . Plaintiff lost $24,900 of revenues due to business interruption when his beauty salon in Baltimore was inactive while he was stuck in Douala, Cameroon, dealing with container clearance delays caused by Defendant(s)[.]" ECF 32 at 3–4; ECF 33 at 3–4.

As already discussed, plaintiff's documentary submissions are woefully deficient. Nor did plaintiff submit even a single affidavit to address the documentary deficiencies.

"In most contract cases, the law of compensatory damages applies, providing a standard measure of compensation limited to the amount of injury incurred under a breach of the contract." *Willard Packaging Co. v. Javier,* 169 Md. App. 109, 122, 899 A.2d 940, 947 (2006). In Maryland, "damages for breach of contract ordinarily are that sum which would place the plaintiff in as good a position as the plaintiff would have been, had the contract been performed." *Tecore, Inc. v. Republic of Yemen*, LKG-23-2230, 2026 WL 1295360, at *5 (D. Md. May 12, 2026). Additionally, a plaintiff has the "obligation to mitigate damages." *Circuit City Stores, Inc. v. Rockville Pike Joint Venture Ltd. P'ship,* 376 Md. 331, 355, 829 A.2d 976, 990 (2003).

Under Maryland law, the measure of damages in a breach of contract action is well settled: "'[U]pon proof of liability, the non-breaching party may recover damages for 1) the losses proximately caused by the breach, 2) that were reasonably foreseeable, and 3) that have been proven with reasonable certainty.'" *Adcor Indus., Inc. v. Beretta U.S.A. Corp.*, 250 Md. App. 135, 154, 248 A.3d 1137, 1147 (2021) (quoting *Hoang v. Hewitt Ave. Assocs., LLC*, 177 Md. App. 562, 594, 936 A.2d 915, 934 (2007)).

"'[P]roximate cause' means losses that actually resulted from the breach.'" *Havtech, LLC v. Tobey-Karg Sales Agency, Inc.*, JRR-22-01051, 2024 WL 3554990, at *9 (D. Md. July 26, 2024) (quoting *Adcor Indus.*, 250 Md. App. at 154, 248 A.3d at 1147). As to the second factor, reasonable foreseeability, "Maryland follows the two-part principle established in *Hadley v. Baxendale,* 9 Exch. 341, 156 Eng. Rep. 145 (1854), for recovery of damages for breach of contract." *Hoang,* 177 Md. App. at 594, 936 A.2d at 934.

The *Hoang* Court explained, *id.* at 594–95, 936 A.2d at 934–35 (internal citations and quotation marks omitted) (emphasis in original):

> The first aspect of that principle holds that when a contract has been breached, the non-breaching party is entitled to damages for the breach such as may fairly and reasonably be considered as arising naturally, *i.e.,* according to the usual course of things from such a breach of contract itself[.] In other words, the plaintiff in a breach of contract action may recover general damages of the sort that are presumed to have been in the contemplation of the parties when the contract was made.
>
> Under the second aspect of the principle set forth in *Hadley v. Baxendale,* a plaintiff in a breach of contract action also is entitled to recover damages such as may fairly and reasonably be supposed to *have been in the contemplation of both parties* at the time they made the contract, as the probable result of the breach of it. Such special or consequential damages are not presumed to have been in the contemplation of the parties when they made their contract but may be shown from evidence of the particular circumstances to have been in their contemplation.

As to the third element, "'[l]osses that are speculative, hypothetical, remote, or contingent either in eventuality or amount will not qualify as reasonably certain' and are not recoverable as contract damages." *Fort Myer Constr. Corp. v. Banneker Ventures LLC*, No. 1002, Sept.term, 2019, 2021 WL 5234692, at *21 (Md. Ct. Spec. App. Nov. 10, 2021). In the "context of lost profits recovery for breach of contract evidence must show that breach was a substantial factor in causing the loss[.]" *Hoang*, 177 Md. App. at 607, 936 A.2d at 942 (citing cases).

According to plaintiff, Ayalex only released Moma's cargo to Mr. Moma on the condition that Moma pay Ayalex $5,916 directly. ECF 1, ¶ 16. This is the amount plaintiff claims Gaza misappropriated from Moma, and which Gaza had promised to pay to Ayalex on behalf of plaintiff. *Id.* ¶¶ 14, 15. Plaintiff seeks to collect damages of $5,916 from both defendants, to compensate Moma for twice paying Gaza and Ayalex "for the same freight forwarding services and fees" because of Gaza's breach of contract. ECF 32 at 3; ECF 33 at 3.

Plaintiff contends that Moma paid Gaza for freight forwarding charges (ECF 1, ¶ 14), citing plaintiff's Exhibit 5, ECF 1-1 at 15. *See* ECF 1, ¶ 14. Plaintiff's Exhibit 5 appears to be a receipt

22

for a payment made to East Coast on an unspecified date, in the sum of $3,000. ECF 1-1 at 15. The receipt does not mention Moma or Gaza. Nor does it specify the purpose of the payment. Moreover, Moma claims that it paid a total of $7,916 to Gaza. ECF 1, ¶ 4. But, the Bill of Lading (ECF 1-1 at 2) reflects that Ayalex charged Gaza a total of $5,916 to coordinate the shipping Moma's cargo. However, it does not show that the invoice was paid. On the information provided by plaintiff, the Court cannot award the requested amount in contract damages.

"*In a tort action for negligence* in Maryland the plaintiff may recover not only for the consequences which have actually and naturally resulted from the tort, but also for those which may certainly or reasonably and probably result therefrom as proximate consequences, but not for consequences which are speculative or conjectural." *Dehn v. Edgecombe*, 152 Md. App. 657, 677, 834 A.2d 146, 157 (2003) (emphasis in *Dehn*) (cleaned up; quotation marks and citation omitted), *aff'd*, 384 Md. 606, 865 A.2d 603 (2005).

Plaintiff alleges that Mr. Moma was "stranded" in Cameroon for two months and three weeks because of Gaza's breach of contract. ECF 1, ¶ 15. Moma explains that Mr. Moma travelled to Cameroon to clear the shipping container through customs. *Id.*

Plaintiff seeks damages that flowed from Mr. Moma's nearly three-month stay in Cameroon to clear plaintiff's cargo through customs. In particular, plaintiff seeks $24,900 for lost revenue to its beauty salon and $7,750 to compensate Mr. Moma for income he lost from his healthcare job because he was in Cameroon. ECF 32 at 4; ECF 33 at 4. In addition, plaintiff requests $4,376 for the hotel charges Mr. Moma incurred during his prolonged stay in Cameroon. ECF 32 at 4; ECF 33 at 4.

The lengthy stay appears to have been necessitated by plaintiff's delay in paying Ayalex. Plaintiff does not make clear why it took nearly three months for Moma to pay $5,916 to Ayalex.

23

Furthermore, plaintiff provides no basis for the Court to find that these damages were foreseeable due to Gaza's negligence. *See Hoang,* 177 Md. App. at 594, 936 A.2d at 934.

Moreover, even if the hotel stay could be compensable, plaintiff did not submit any documentation to support his claim for costs associated with his stay in Cameroon. Nor has Moma documented its claim of lost business revenue or Mr. Moma's claim for loss of income. Indeed, there is no basis in the record on which to award such damages.

In the Complaint, plaintiff alleges that it incurred an additional demurrage fee because defendants "failed to notify him in a timely manner" when "the US Customs inspection was completed[.]" ECF 1, ¶ 10. No sum is mentioned. In the Motions, plaintiff claims that defendants' negligence "caused plaintiff to pay $3,200 for demurrage because he was assigned a wrong container, was not notified in a timely manner when his container was flagged for secondary inspection, and was not notified when it was ready for pick up[.]" ECF 32 at 3–4; ECF 33 at 3–4.

In support of Moma's claim that Moma spent an additional $3,200 in demurrage fees, plaintiff cites Exhibit 2, at ECF 1-1 at 4–6. *See* ECF 1, ¶ 10. As noted, Exhibit 2 consists of a blurry picture of a receipt from PNC Bank that shows a transaction amount of $3,500 and bills issued by RTC. ECF 1-1 at 4–6. The receipt has the words "Ndoh Payment Container" handwritten on it. *Id.* But, the receipt does not reflect the payee or the purpose of the payment. Moma also provided copies of bills issued by RTC. *Id.* at 5–6. The documents issued by RTC reflect a charge of $262,827 Central African CFA francs. *Id.* at 5–6. But, plaintiff does not indicate the value of that amount in U.S. currency. And, those bills along with other exhibits are written in French, but plaintiff has not provided English translations of these exhibits. *See id.* at 5–8.

On this record, it is impossible for the Court to determine whether plaintiff actually paid $3,200 in a demurrage fee. Therefore, the Court cannot award plaintiff the requested

24

compensation.

In reviewing the Motions, the Court notes another informational gap that prevents it from adjudicating plaintiff's request for damages. Plaintiff has not provided the Court with any information as to the amount it recovered from East Coast in the resolution of its claims against that defendant.

"'It is generally recognized that there can be only one recovery of damages for one wrong or injury. Double recovery of damages is not permitted; the law does not permit a double satisfaction for a single injury. A plaintiff may not recover damages twice for the same injury simply because he has two legal theories . . . . The overlapping of damages is generally not permissible, and a person is not entitled to recover twice for the same elements of damage growing out of the same occurrence or event . . . .'" *Maryland Prop. Mgmt., LLC v. Peters-Hawkins*, 249 Md. App. 1, 36 245 A.3d 1, 22 (2021) (quoting 25 C.J.S. *Damages*, § 3) (alterations in *Peters-Hawkins*); *see Nichols v. Wilson*, 296 Md. 154, 159, 460 A.2d 57, 60 (1983) (same).

In the Motions, plaintiff seeks compensatory damages connected to the shipping of its cargo from Baltimore to Cameroon. Because plaintiff has not provided the Court with any information as to the terms of settlement between East Coast and Moma, the Court cannot determine whether plaintiff already received compensation for the harm it suffered in relation to the shipping of its cargo and, if so, the amount. Without this information, the Court is unable to determine whether a set off is appropriate.

The court may make a determination of damages without a hearing, if there is an adequate evidentiary basis in the record to support an award of the requested damages. *See Adkins*, 180 F. Supp. 2d at 17. That is not possible here. However, when, as here, the record is inadequate, the court may conduct an evidentiary hearing with regard to damages. *See* Rule 55(b)(2). Of import,

"[t]he party seeking default judgment bears the burden of establishing entitlement to recovery." *Parrish v. Leithman*, 733 F. Supp. 3d 371, 374 (D. Md. 2024); *see Rios v. Winners Auto Sale, LLC*, DKC-23-1140, 2024 WL 1833136, at *7 (D. Md. Apr. 26, 2024).   Therefore, a hearing will be required for plaintiff to prove its damages. *See Rios,* 2024 WL 1833136, at *8.

A defendant in default may contest the amount the plaintiff seeks in damages. *See Buchannon v. Associated Credit Servs., Inc.,* RTB-20-02245, 2021 WL 5360971, at *10 (S.D. Cal. Nov. 17, 2021) ("[D]efault may establish liability but does not qualify as an admission on damages. There are many instances where a defendant may want to reduce attorney's fees and costs by admitting liability but challenge damages, and preventing a defendant from doing so would not serve the interests of judicial economy.").  This means that defendants Ayalex and Gaza are entitled to appear and participate.[11]

In sum, plaintiff has not proven its entitlement to damages.  Therefore, a ruling on its motion for entry of default judgment will be deferred with respect to its request for damages.

### IV.   Conclusion

For the reasons stated, I shall grant plaintiff's Motions in part.  But, I shall defer ruling on the damages request, pending a hearing to determine plaintiff's entitlement to damages.

The damages hearing shall convene at **11:00 a.m.** on **August 25, 2026**.  However, by the close of business on **August 6, 2026**, plaintiff must advise the Court, in writing, of its intention to pursue its claim for damages and to appear at the hearing.  If plaintiff fails to advise the Court, as

---

[11] Of import, Local Rule 101.1(a) provides: "All parties other than individuals must be represented by counsel." Accordingly, if Ayalex seeks to appear at the hearing, it must retain a lawyer. On the other hand, "[i]ndividuals who are parties in civil cases may . . . represent themselves." *Id.* Accordingly, Mr. Gaza can appear at the hearing without legal representation. Notably, individuals "representing themselves are responsible for performing all duties imposed upon counsel by [the Local Rules] and all other applicable federal rules of procedure." *Id.*

directed, the Court will assume that plaintiff does not wish to pursue its claim for damages.  The

Court will then cancel the hearing, deny the request for damages, and close the case.

An Order follows.


Date:   July 20, 2026                                                    /s/

Ellen Lipton Hollander
United States District Judge